U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2013 FEB 27 PM 2: 52

CLERK
BY _____ RC _____
DEPUTY CLERK

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

JAMES BOULE, )
)
Plaintiff, )
)
v. ) Case No. 5:12-cv-7
)
PIKE INDUSTRIES, INC., )
)
Defendant. )

## OPINION AND ORDER
## GRANTING IN PART AND DENYING IN PART
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
(Doc. 23)

Plaintiff James Boule brings this action against Defendant Pike Industries, Inc.

("Pike") seeking compensatory and punitive damages arising out of Pike's termination of

his employment on May 13, 2011. In his five count Complaint, Mr. Boule alleges claims

of promissory estoppel, breach of implied contract, breach of Vermont's Occupational

Safety and Health Act, 21 V.S.A. §§ 221-32 ("VOSHA"), and "compelling public

policy." The thrust of Mr. Boule's Complaint is that Pike unlawfully terminated his

employment in retaliation for his raising safety concerns.

Presently before the court is Pike's motion for summary judgment, (Doc. 23)

which Mr. Boule opposes. The court heard oral argument on October 24, 2012 and the

parties' post-argument submissions on the applicability of the "cat's-paw" theory[1] were

completed on November 2, 2012.

---

[1] The "cat's paw" theory was adopted by the United States Supreme Court in *Staub v. Proctor Hosp.*, 131 S. Ct. 1186 (2011) wherein the court held that "[i]f a supervisor performs an act motivated by antimilitary animus that is intended by the supervisor to cause an adverse employment action, and if that act is a proximate cause of the ultimate employment action, then the employer is liable under the Uniformed Services Employment and Reemployment Rights Act of 1994" ("USERRA"), 38 U.S.C. § 4311. *Staub*, 131 S. Ct. at 1187.

Mr. Boule is represented by James A. Dumont, Esq. Pike is represented by Michael F. Hanley, Esq. and Paul J. Perkins, Esq.

## I. Plaintiff's Statement of Additional Facts.

Pike has filed a statement of undisputed material facts to which Mr. Boule has responded by admitting certain facts, disputing others, and submitting forty-three paragraphs of additional facts which he contends provide the context in which the court must consider this case. The parties have stipulated that Mr. Boule may amend his facts to include facts derived from the deposition of Paul Morse which took place after Pike filed its motion for summary judgment. Their stipulation is silent as to whether they also agree that Mr. Boule's remaining additional facts may be considered. Pike has not moved to strike Mr. Boule's additional facts, nor has it responded to them in any other manner. Accordingly, for the most part, it is impossible for the court to determine whether Mr. Boule's additional facts are disputed.

In *Schroeder v. Makita Corp.*, 2006 WL 335680 (D. Vt. Feb. 13, 2006) (Sessions, C.J.), this court ruled that "the Local Rules do not provide an opportunity for the nonmoving party to file a statement of *undisputed* facts at the summary judgment stage." *Id.* at *3. The court explained:

> Local Rule 7.1(c)(2) afforded Schroeder [the party opposing summary judgment] the opportunity to bring relevant disputed factual matters to the Court's attention, and he took full advantage of this opportunity by filing a 33-page response to Makita's statement of undisputed facts. The Local Rules make no provision for the second document filed by Schroeder. Furthermore, because a party's ability to withstand summary judgment depends on the existence of disputed facts, not undisputed ones, there is no need for Schroeder to establish undisputed facts at this stage of the litigation. Accordingly, the Court will strike Schroeder's "Statement of Undisputed Facts," and Makita is under no obligation to respond to it. The Court will not consider the document in its disposition of the remaining motions.

*Id.* at *4. The court adopted this same approach in *Post v. Killington Ltd.*, 2010 WL 3323659, at *1 n.1 (D. Vt. May 17, 2010), although it considered any additional facts that were both integral to the parties' arguments and undisputed.

Local Rule 56(b) (effective January 1, 2011) provides that "a party opposing summary judgment . . . must provide a separate, concise statement of disputed facts. All material facts in the movant's statement of undisputed facts are deemed to be admitted unless controverted by the opposing party's statement." The Rule does not contemplate the filing of a statement of undisputed facts by the non-moving party.

In this case, the court will follow *Schroeder* and *Post* and disregard Mr. Boule's additional facts unless it is clear from the parties' briefing that those facts are both material and undisputed.

## II. Undisputed Facts.

### A. Pre-termination Events.

On April 29, 2002, Mr. Boule applied for employment with Pike. He completed a written application for employment, which included the following provision:

> I understand and agree that, if hired, my employment will be at-will and may be terminated with or without notice at any time at my option or at the option of Pike. I understand that only a written agreement expressly to the contrary signed by me and the president of Pike Industries can vary this employment-at-will policy. I agree to conform to the policies and procedures of Pike Industries.

(Doc. 23-1 at ¶ 1.)

On May 7, 2002, the day he was hired by Pike, Mr. Boule signed an acknowledgement form, confirming that he had received certain training and agreed that he will "be held accountable for the information contained [in the Employee Manual]." (Doc. 23-7 at 2.) Above his signature on the acknowledgement form is the following statement:

> I agree to conform to the policies, practices, and procedures of Pike Industries, Inc. I understand that my employment will be at-will and may be terminated with or without notice at any time at my option or at the option of Pike Industries. I also understand that only a written agreement expressly to the contrary signed by me and the President of Pike Industries, Inc. can vary this [e]mployment-at-will policy."

*Id.*

From 2002 until his termination in 2011, Mr. Boule worked at Pike's New Haven facility where his duties including driving a "haul truck" which moves rocks to the

"crusher" where those rocks are transformed into "crushed stone" used in construction and road building. Mr. Boule also participated in Pike's cross-training program -- the nature and purpose of this program is disputed. Pike "concedes that Mr. Boule was a productive (albeit inflexible and irascible) employee who was a good truck driver." (Doc. 44 at 15.)

In the course of his employment, Pike provided Mr. Boule with a wallet-size card that states:

**DO WHAT'S RIGHT-- SPEAK UP!**

If you ever have a concern about unethical, illegal or unsafe activity, do not keep it to yourself! Speak up. Discuss any concerns with the appropriate supervisor or manager. If you prefer to remain anonymous, contact The Network.

**Oldcastle Ethics & Compliance Hotline**
Call toll-free: 888-212-2698
or report online at: www/tnwinc.com/oldcastle,
Toll-free, 7 days a week, 24 hours a day.

(Doc. 10 at 3.)

On April 30, 2011, Mr. Boule made a toll-free telephone call to the "Ethics and Compliance Hotline," an independent service which allows Pike's employees to make anonymous complaints. According to the report of the independent provider who received the telephone call,[2] Mr. Boule made the following statements:

Caller, DECLINED, reported that over the past two years, dates unknown, this location has been hiring younger members of Management, names

---

[2] Mr. Boule objects to this report as inadmissible hearsay, however, it purports to contain admissions by a party opponent and is thus admissible under Fed. R. Evid. 801(d)(2). *See United States v. Reed*, 227 F.3d 763, 770 (7th Cir. 2000) (non-hearsay status for opposing party's admissions applies to any statement and "the statements need neither be incriminating, inculpatory, against interest, nor otherwise inherently damaging to the declarant's case."). Mr. Boule remains free to dispute the accuracy of the statements he is reported to have made, however, that challenge goes to the report's weight, not its admissibility. The report itself contains the following disclaimer: "The information contained in this report was provided by a third party source. The Network, Inc. does not verify the accuracy or the completeness of the information in this report, and therefore, cannot guarantee its accuracy or completeness." (Doc. 23-9 at 3.)

UNKNOWN. These younger members of management have placed the Older Workers, names UNKNOWN on mechanical jobs when they should be doing another job. The older workers fear speaking up about what is going on because if something is said 'you will be out of there.' Caller is concerned that his/her age is an issue with younger members of management.

The younger members of management overstaff and as a result employees are standing around ten to twelve hours a day with no work to do. Also, the younger members of management go in on the weekend to check the pumps when there is no need to check the pumps. Caller said the younger members of management do not have the knowledge to know what is going on, but feels with more training they can do a better job. However, in the mean time [sic] this issue is costing the company money that they should not be paying out.

Caller would like this issue to be investigated.

(Doc. 23-1 at ¶ 5.) The report contains a preprinted question: "How does the caller know about hotline" with the following answer: "Wallet Card[.]" (Doc. 23-9 at 3.)

After the call was placed, the independent provider forwarded the report to Pike's Human Resources department. The independent provider did not disclose the identity of the caller to Heidi Dimick, a Pike employee charged with responding to the call, or to Kelly Perry, Pike's Director of Human Resources. As a result of this telephone call to the "hotline," Ms. Dimick and Scott Rielly, Pike's "Crushing Manager," conducted an investigation. Ms. Dimick and Mr. Rielly believed the caller was complaining about friction between older and younger employees at the New Haven facility and that this might be considered age discrimination. They both surmised, albeit incorrectly, that the caller was Alexis Seraus, another Pike employee who had complained about personality disputes at the New Haven facility in a recent email to management.

During the course of their investigation, Ms. Dimick and Mr. Rielly interviewed ten employees, including Mr. Boule. Ms. Dimick and Mr. Rielly asked each employee the following questions:

a) Do you feel there is a separation between younger and older workers in the New Haven yard?

b) Do you have concerns with the management in this yard?

c) Do you feel the yard is overstaffed?

d) Do you check the pumps on the weekend or do you know who in the yard does?

e) Do you feel the company is wasting money in the New Haven yard?

f) Are there any other concerns you'd like to bring to our attention while we're here?

(Doc. 23-14 at 2.) On May 6, 2011, Ms. Dimick and Mr. Rielly interviewed Mr. Boule. Ms. Dimick's notes of the interview reflect the three discussed a number of subjects, including friction between employees and waste of company resources; only one of her bullet points reflect a concern that Mr. Boule did not want to "get hurt or have an accident."[3]

---

[3] Ms. Dimick's interview notes reflect the following:
- 2 groups-younger and older.
- The younger bosses don't understand everything.
- Do know a lot about stripping.
- Where to put a road.
- +/- make suggestions and they don't listen to what I say (to Randy [Alemy] and Nick).
- The younger bosses are good people, they just don't have the experience.
- I don't want to get hurt or have an accident.
- I mentioned the bin to Nick. Nothing ever came of it.
- Most things we can work together on (younger and older), but they have pride. But give us some respect, we've earned it.
- I don't believe in having guys up there standing around doing nothing on overtime. We don't need to waste company money. Let's use our head, they should think of the company.
- I think Randy [Alemy] should be up there more.
- It's handy to have Randy [Alemy] around.
- We went down the other day, had to shovel. Asked Randy [Alemy] if he could get us some round shovels, we had square ones, he wouldn't go do it. He had to watch the crane.
- I got a lot of respect for both of them. They need to be more on the business side of things.
- He doesn't think we're overstaffed @ the crusher.

**B.     The Confrontation.**

At 6:00 a.m. on the morning of May 12, 2011, Mr. Boule gathered with other employees at the New Haven facility before work -- the parties dispute whether this was a pre-arranged stretching exercise program or a pre-shift meeting, although they agree the meeting included exercises. At some point in the exercises or their aftermath, Mr. Boule and his supervisor, Randy Alemy, had a confrontation. Many aspects of the confrontation are disputed, however, the following is undisputed.

The parties agree that Mr. Boule often engaged in "kidding" during the morning exercise session and he acknowledged that, on the day in question, he "did bust [Mr. Alemy's] chops maybe too much" in front of other Pike employees. One of Mr. Boule's co-workers, apparently referring to the cross-training program, yelled "Hey you asshole, or something like that, what do you think of the switching the drivers?" (Doc. 23-17 at 2.) Mr. Boule believed this statement was intended to "bust his chops" and responded "I think it's a big safety violation." *Id.* at 2. Mr. Alemy, hearing the exchange, asked Mr. Boule: "What the fuck is your problem?"[4] *Id.* This upset Mr. Boule because he and his co-worker had been kidding around and Mr. Alemy appeared angry. Mr. Alemy further stated: "I've heard enough of your mouth for the last three weeks." *Id.* at 2-3. Mr. Boule became angry and told Mr. Alemy: "I don't want to hear any of your shit, you're

---

- I think the younger guys need to think a little more.
- Scott R. told him to speak up if he felt there was too many people standing around.
- They treat me good.
- I don't want to work the long hours.
- Nick is stretched thin when he has to water the yard.
- The bosses might have to come in to work Saturdays.
- We'll need a lot of rip rap.
- I enjoy working with the young guys.
- Asked if someone checked the pumps on weekends and he said they must have to but I don't know who is doing it.

(Doc. 23-15 at 2-3.)

[4] The parties dispute whether Mr. Alemy "hollered" this remark from ten feet away.

allowing those people to do this cross-training." *Id.* at 3. Mr. Alemy replied, "Well, you're a -- you're a frigging pain in the ass to me. You're causing me troubles." *Id.*

The parties dispute how and when Mr. Alemy and Mr. Boule approached one another. Paul Morse, a witness to the confrontation, believes that at some point the stomachs of the two men, which both have "a little overhang," touched. (Doc. 39-1 at 13.) Mr. Boule called Mr. Alemy a "punk," and, apparently referring to the fact that Mr. Alemy had been a captain in the Army, told him "don't try to play Army with me." (Doc. 23-18 at 3.) As Mr. Boule was wagging his finger in Mr. Alemy's face, Mr. Alemy told Mr. Boule to leave the site and return the next morning at 6:00 a.m. As he was leaving, Mr. Boule told the crew: "If you're smart, you'll go with me" or words to that effect (Doc. 23-21 at 2; 23-23 at 2.) A co-worker approached Mr. Boule and asked: "Why did you get so mad?" "You aren't doing it right" and "You both are acting like children." *Id.* Mr. Boule concedes that both his and Mr. Alemy's conduct was "stupid," that they were both "pretty loud," both made inappropriate verbal comments, and both violated company policy.[5] (Doc. 23-1 at 7-10.)

After Mr. Boule left the New Haven facility on the day of the confrontation, Mr. Alemy talked to Scott Rielly about what had happened. He then sent an email to Mr. Rielly and Ms. Dimick, stating that he had sent Mr. Boule home for the day. Ms. Dimick replied to Mr. Alemy by email, asking him to memorialize the event. Mr. Alemy prepared an email response and sent it to Ms. Dimick and Mr. Rielly. The email stated that Mr. Boule had initiated the conflict by repeatedly interrupting Mr. Alemy during a conversation Mr. Alemy was having with another employee about the cross-training program. Mr. Alemy told Mr. Boule: "What I need from you right now is to stop running your mouth." (Doc. 23-23 at 2.) The email reported that in response to this comment, Mr. Boule told Mr. Alemy: "You shut-up" and "Don't try to play Army with me." Mr. Boule came toward Mr. Alemy, "stopped a few inches from [Mr. Alemy's] face, repeated

---

[5] Mr. Boule objects to the court's consideration of his admission that he, as well as Mr. Alemy, violated Pike's policies because his deposition testimony to this effect was preceded by a series of unrelated questions. He cites no grounds for excluding his admission on that basis and the court has found none.

the Army comment, and pushed [Mr. Alemy] with his stomach." (Doc. 23-23 at 2.) The email reported that "[a]s soon as Mr. Boule made contact," he was told to leave for the day whereupon he left, yelling back to the rest of the crew, "[i]f you guys are smart, you'll follow me." (Doc. 23-24 at 4.) The email did not refer to Mr. Alemy's use of profanity and did not refer to the nature of Mr. Boule's complaints about the cross-training program.

### C.    The Termination.

By email, Ms. Dimick forwarded Mr. Alemy's statement to Kelly Perry, Pike's Director of Human Resources, and asked Ms. Perry for permission to terminate Mr. Boule. Ms. Perry, in turn, emailed Christian Zimmermann, Pike's President, asking him to approve Ms. Dimick's request to terminate Mr. Boule and another employee in an unrelated incident. In the email she stated: "Please see the two termination requests below. I support both term[ination]s, although I think Randy [Alemy] could have handled his interaction with Jim Boule in a more professional manner. Telling a subordinate to 'stop running your mouth' in front of peers is not good leadership. We can address this concern separately." *Id.* at 2-3. By email, Mr. Zimmermann replied: "I approve both terminations. Someone needs to speak with Randy about keeping his composure during confrontations." *Id.* at 2.

Thereafter, Pike disciplined, but did not discharge, Mr. Alemy. He received a written reprimand and was required to attend a structured leadership course to refine his communication, conflict management, and team building skills.

At approximately 10:00 a.m. on the morning of May 13, 2011, Ms. Dimick and Mr. Rielly met with Mr. Boule. After a short conversation, during which Ms. Dimick did not take notes, she terminated Mr. Boule's employment and then memorialized her recollection of the interview thereafter.

On May 14, 2011, the day after his termination, Mr. Boule made another call to the hotline. The independent provider who received this telephone call filed a report which stated as follows:

5/14/2011 8:50:21 AM – Caller Call Back

Caller called back and was informed there was no company response.

> The caller said that on 05/13/2011 he/she was terminated for yelling at Supervisor, Randy ALMAY [sic]. He/She was also accused of bumping ALMAY [sic]. The caller said that they were arguing in close proximity, but no contact was made intentionally. He/She believed that he/she was terminated in retaliation of filing this report because he/she had no disciplinary action taken against him/her prior to the termination. The caller felt the termination was harsh, otherwise. He/She said that Old Castle is a very safe-minded [sic] company so members of management did not like when employees spoke out about safety issues.

(Doc. 23-1 at ¶ 45.)

### D.    Pike's Employment Policies.

Pike has a sixty-four page written employee manual (the "Manual") that states that "[t]he [i]nformation contained in this booklet has been prepared as an aid and a guideline to give you a better understanding of your job at Pike. It contains information about what you can expect from the company, and in turn what the company expects from you." (Doc. 23-4 at 4.) On its first page, the Manual states: "In this booklet, you will find information about our company policies, practices, and procedures. However, the policies and statements that may be issued from time to time are not a contract of any kind. Although they reflect current policy, they may be changed or rescinded at any time." *Id.* The Manual contains a "disciplinary action policy," which provides in relevant part:

> Failure to observe established safety rules and safe work practices will result in disciplinary action. Disciplinary action will be carried out at the discretion of the supervisor (or manager). The following are examples of the types of discipline that may be imposed, depending on the seriousness of the offense and the employee's cumulative records:
>
> > Verbal warning
> > Written warning
> > Suspension without pay
> > Termination

The employee's supervisor will document all forms of discipline. Documentation of written warnings will be placed in the employee's personnel file.

The following are examples of behavior that is prohibited and could result in discipline, up to and including termination. Certain conduct may result in immediate termination, based on the severity of the incident and surrounding circumstances, as well as repeat occurrence(s).

. . .

5. Engaging in behavior, either verbal or physical, which is intimidating, threatening, or abusive towards supervisors, co-workers, customers, or members of the public.

. . .

14. Fighting, horseplay, and reckless operation of equipment or vehicles and loud or abusive behavior.

. . .

The above lists are not intended to be all-inclusive. Employment at Pike is considered at-will and Pike reserves the right to discharge an employee without cause and without prior notice. Pike will also abide by the Oldcastle Materials Safety Violation Disciplinary Guidelines.

(Doc. 23-4 at 37.)

Immediately following the foregoing provisions, the Manual sets forth the "Oldcastle Materials Safety Violation Discipline Guidelines" (the "Oldcastle Disciplinary Guidelines") which identify three categories of safety violations. "Serious" violations are "[s]ubject to [i]mmediate [t]ermination" and include "[p]hysically assaulting a co-worker" and "[a]ny [c]onfined [s]pace violation." *Id.* at 37. A second category of "[s]erious" violations are "[s]ubject to 'Two Strike' rule: 1st offense written warning plus minimum 5-day suspension without pay: 2nd is termination." *Id.* The type of activity listed in this category is not relevant to the facts of this case. The third category is entitled "All Other" and includes "[a]ny other violation of Company safety rules/policies/procedures, or any Federal/State/local regulations will be subject to the 'Three Strike' rule." *Id.* at 38.

The Oldcastle Disciplinary Guidelines describe the "Three Strike" rule as: "1st offense is a written warning from supervisor/foreperson[;] 2nd offense is a written warning plus a minimum 5-day suspension without pay[;] [and] 3rd offense is immediate

termination." *Id.* They provide that "[t]he Company reserves the right to terminate on first offense for any willful disregard of safety that has or could have resulted in serious injuries to the employee or co-worker" and that "[a]ny supervisor who is aware of and allows an unsafe act will receive the same discipline as the employee." *Id.*

Pike's "Work Place Violence Policy" ("WPV Policy") follows the Oldcastle Disciplinary Guidelines in the Manual. In its "Purpose" section, the WPV Policy states that "Pike Industries is committed to preventing workplace violence and maintaining a safe working environment. As such, threatening behavior or violent acts committed by or against employees will not be tolerated." *Id.* at 38. The Manual states that "[t]he Company has adopted the following guidelines and procedures for potential incidents of workplace violence" and identifies "Prohibited Conduct" as including "engaging in behavior that creates a reasonable fear of injury in another person" and "threatening to injure an individual[.]" *Id.* It further states that "[a]ny employee who engages in prohibited conduct or other acts of aggression or violence will be subject to immediate discipline, up to and including termination." *Id.* The WPV Policy provides the following "Reporting Procedures" for safety violations:

> Any potentially dangerous situation must be reported immediately to a supervisor. If a supervisor is not available, contact the local Human Resources Department or 911 in extreme emergencies. Reports can be made anonymously and all reported incidents will be investigated. Reports or incidents warranting confidentiality will be handled appropriately and information will be protected as much as is practical.

*Id.* The Manual concludes with an "Acknowledgement Form" requiring the employee to acknowledge that it is the employee's responsibility to read and understand the Manual and to "agree to comply with and incorporate into [the employee's] daily work activities, the policies and procedures set forth in this [M]anual." *Id.* at 39. The employee is required to acknowledge that Pike may amend the Manual in its discretion and without prior notice but on the preceding page, Pike promises that "[w]hen such changes are made, you will be given as much notice as possible." *Id.*

## III. Disputed Facts.

The parties dispute the nature of the New Haven facility's 2011 cross-training program. Pike asserts that it was a program to provide coverage for employees who were absent. Mr. Boule asserts that the program consisted of having inexperienced employees operate haul trucks in a manner that was dangerous to the employees and to the public. He contends that he repeatedly protested that it was a dangerous practice to his supervisors who responded by terminating his employment.

The parties dispute the nature of the hotline calls. Pike provides the records of two hotline calls. Mr. Boule claims the records inaccurately reflect the concerns he raised, that there were three hotline calls, and that he discussed safety concerns in each of them. In addition, he asserts that he repeatedly raised safety concerns to Mr. Rielly and Mr. Alemy, as well to a Mr. Madison, prior to his termination and was addressing a safety concern at the time of his confrontation with Mr. Alemy.

The parties dispute several aspects of the confrontation between Mr. Boule and Mr. Alemy. According to Mr. Boule, he was engaged in a conversation with another employee, "Chris," when Mr. Alemy arrived. Chris and Mr. Boule knew Mr. Alemy could overhear their conversation, so he and Chris joked about how some of the work from the day before had been wasted, which they both knew was not true. Mr. Boule contends that Mr. Alemy angrily approached and confronted him, using profanity, and thereby altered a casual joking exchange between co-workers into a confrontation between Mr. Boule and his supervisor. Mr. Boule points to Paul Morse's testimony which supports a conclusion that Mr. Alemy initiated the confrontation and "stepped out" towards Mr. Boule. Mr. Boule contends that Mr. Alemy thereafter provided a false version of the events to Pike which, in turn, acted on that false version in terminating Mr. Boule's employment. In contrast, Pike claims that Mr. Boule was attempting to provoke Mr. Alemy during the early morning session, and that when Mr. Alemy responded, albeit with profanity, Mr. Boule persisted in his provocation, using loud and abusive language in close proximity to his supervisor.

Mr. Boule further contends that Ms. Dimick falsely reported to Ms. Perry that witness interviews corroborated Mr. Alemy's version of the confrontation although Human Resources conducted no interviews itself. Instead, Mr. Alemy testified that he conducted the interviews although Paul Morse, a witness to the encounter, testified that he was not interviewed.

The parties also dispute the content of Mr. Boule's pre-termination interview with Ms. Dimick and Mr. Rielly. Ms. Dimick claims that Mr. Boule admitted to "chest pumping" Mr. Alemy. Mr. Boule contends that he may have told Ms. Dimick that it was possible that the two men's stomachs touched. In deposition, Mr. Boule testified that he does not believe any actual touching occurred. Ms. Dimick's notes of the pre-termination interview state that when Mr. Boule learned he would be terminated he stated he "should have done it right and punched him in the head." (Doc. 23-10 at 4.) Mr. Boule testified that "[w]hat I said was his father should have given him an extra kick in the ass when he was younger, and I don't know where that came from. I would never punch him; I liked him. I had no reason to punch him." (Doc. 29-3 at 78-79.)

In deposition, Pike did not ask Mr. Boule whether Pike had made statements to its employees regarding progressive discipline or had a practice of progressive discipline. Mr. Boule contends that Pike practiced progressive discipline during his approximately nine years there and cites evidence to support that conclusion, including Ms. Dimick's testimony that she has never witnessed anyone terminated at Pike without cause and her further testimony that she doesn't know whether Mr. Boule would have been terminated if Mr. Alemy initiated the conflict, if it did not involve a physical assault, and if the confrontation began with a discussion of safety.

## IV.    Conclusions of Law and Analysis.

### A.    Standard of Review.

Summary judgment must be granted when the record shows there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). "[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and

identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotations and citation omitted). In deciding the motion, the trial court must resolve all ambiguities and draw all reasonable inferences in favor of the non-moving party, and deny the motion if a rational juror could decide in favor of that party under the applicable law. *Scott v. Harris*, 550 U.S. 372, 378 (2007). "There is no material fact issue only when reasonable minds cannot differ as to the import of the evidence before the court." *Commander Oil Corp. v. Advance Food Serv. Equip.*, 991 F.2d 49, 51 (2d Cir. 1993).

To avoid summary judgment the non-moving party must offer more than "mere speculation and conjecture[,]" *Harlen Assoc. v. Inc. Vill. of Mineola*, 273 F.3d 494, 499 (2d Cir. 2001), as the "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). In other words, only "disputes over facts that might affect the outcome of the suit under governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* at 249.

Pike contends that even when the disputed facts are viewed in the light most favorable to Mr. Boule, summary judgment remains appropriate. Mr. Boule counters that genuine issues of material fact preclude summary judgment and Pike has failed to establish its entitlement to judgment as a matter of law.

## B. Promissory Estoppel Claim.

In Count 1, Mr. Boule asserts a claim of promissory estoppel,[6] alleging that Pike made representations that employees should voice safety concerns and promised that

---

[6] In Count 2 of his Complaint, Mr. Boule asserts a claim of "promissory estoppel as to progressive discipline," but subsequently advised the court that he would be filing an amendment to withdraw that claim. *See* Doc. 29 at 14 ("Plaintiff will file an amendment to the Complaint

employees who did so would not be retaliated against. He asserts that he relied upon these alleged promises to his detriment and was terminated because he raised safety concerns that provoked his supervisor, Mr. Alemy, into fabricating his version of their confrontation. He points to the Manual, the Oldcastle Disciplinary Guidelines, the WPV Policy, and the wallet-sized card as the sources of those promises.

Pike argues that Mr. Boule's promissory estoppel claim must be dismissed because Mr. Boule cannot establish the essential elements of detrimental reliance and a causal nexus between his calls to the "hotline" service and his termination as there is no evidence that any of those calls involved safety concerns. Even if a nexus could be found, Pike contends that no rational jury could conclude that Pike's termination of Mr. Boule was wrongful based upon the facts and circumstances of this case.

Under Vermont law, "even if an employee otherwise enjoys only at-will employment status, that employee may still be able to establish a claim for wrongful termination under a theory of promissory estoppel[.]" *Dillon v. Champion Jogbra, Inc.*, 819 A.2d 703, 709 (Vt. 2002). "Establishment of promissory estoppel requires (1) a promise on which the promisor reasonably expects the promisee to take action or forbearance of a substantial character; (2) the promise induced a definite and substantial action or forbearance; and (3) injustice can be avoided only through the enforcement of the promise." *Green Mountain Inv. Corp. v. Flaim*, 807 A.2d 461, 464 (Vt. 2002). The "first two elements of promissory estoppel are for the finder of fact," *id.* (citing *City of Powell v. Busboom*, 44 P.3d 63, 66 (Wyo. 2002)), while the "determination of 'whether injustice can be avoided only by the enforcement of the promise' is a question of law[.]" *Id.* (quoting *Tour Costa Rica v. Country Walkers, Inc.*, 758 A.2d 795, 801 (Vt. 2000)). Because these elements are derived from the definition of promissory estoppel "set forth in the Restatement (Second) of Contracts § 90(1)[,]" *Foote v. Simmonds Precision Prods. Co.*, 613 A.2d 1277, 1281 (Vt. 1992), the court looks to the Restatement for

---

withdrawing Count 2. Based on the [d]iscovery obtained, it appears that the issues related to progressive discipline are more appropriately addressed under the law of implied contract, which is the subject of Count 3."). He has not yet filed an amendment but the court will nonetheless treat the claim as abandoned.

guidance. In addition, the court is guided by *Mers v. Dispatch Printing Co.*, 483 N.E.2d 150 (Ohio 1985), cited by the *Foote* court with approval, which holds that an employer's representations must be interpreted from the perspective of a reasonable employee and that where ambiguous, "the meaning of the [employer's] promise, and whether the acts flowing from it were reasonable, are questions of fact for jury determination." *Mers*, 483 N.E.2d at 155.

Pike does not squarely address whether it made any promises to Mr. Boule that offered him protection from retaliation if he raised legitimate safety concerns. As Mr. Boule points out, the Restatement (Second) of Contracts defines the term "promise" broadly:

> the word "promise" is not limited to acts having legal effect . . . [rather] the word "promise" is commonly and quite properly also used to refer to the complex of human relations which results from the promisor's words or acts of assurance, including the justified expectations of the promisee and any moral or legal duty which arises to make good the assurance by performance. The performance may be specified either in terms describing the action of the promisor or in terms of the result which that action or inaction is to bring about.

Restatement (Second) of Contracts § 2 (1981). The Vermont Supreme Court has nonetheless held that an employer may not be bound by a "vague assurance" but only by a promise "of a specific and definite nature[.]" *Dillon*, 819 A.2d at 710.

Here, Pike provided Mr. Boule with a wallet-sized card that stated: "If you ever have a concern about unethical, illegal or unsafe activity, do not keep it to yourself! Speak up. Discuss any concerns with the appropriate supervisor or manager. If you prefer to remain anonymous, contact The Network." (Doc. 10 at 3). The Oldcastle Disciplinary Guidelines and WPV Policy both affirmatively require employees to report safety concerns and offer them certain protections in the event that they do so. The Manual further warns employees that "[t]he Company reserves the right to terminate on the first offense for any willful disregard of safety that has or could have resulted in serious injuries to the employee or co-worker" and that "[a]ny supervisor who is aware of and allows an unsafe act will receive the same discipline as the employee." *Id.* at 38.

Construing these statements in the light most favorable to Mr. Boule, they may reasonably be interpreted as promising that an employee who brings legitimate safety concerns to Pike's attention will not be disciplined as a result.

Pike more directly challenges Mr. Boule's ability to satisfy the requirement of detrimental reliance, contending that Mr. Boule did not express concerns about safety when he called the hotline and that, even if he did, the persons who terminated his employment did not know he was the person who called. As Mr. Boule points out, Pike construes the facts too narrowly and disregards the facts that are disputed. According to Mr. Boule, he made three calls to the hotline, all three of which addressed safety. Two undisputed facts support this claim. First, the independent provider who took the first hotline call reported that it had been made in response to a "Wallet Card[.]" (Doc. 23-9 at 3.) The Wallet Card provides a hotline for safety concerns, not general grievances or concerns about age discrimination. Second, the post-termination call reflects that the caller has called back and appears to reflect a prior hotline call about safety. In addition, there are disputed facts regarding whether Mr. Boule made numerous pre-termination verbal complaints to supervisors at Pike, including Mr. Rielly and Mr. Alemy, and that he was discussing a safety concern when the confrontation began. He argues that Mr. Alemy's angry response to his comments, construed in the light most favorable to Mr. Boule, supports a conclusion that Mr. Alemy was frustrated by Mr. Boule's repeated challenges to the cross-training program. Pike appears to concede as much, acknowledging:

> . . . Although it is clear that Mr. Alemy rejected Mr. Boule's criticism of the cross-training program, as he rejected his criticism on a wide variety of matters, there is no evidence that Mr. Alemy believed the cross-training program created an unreasonable risk of injury to employees or violated state or federal workplace safety regulations. Mr. Alemy's failure to report Mr. Boule's opinion that the cross-training program was unsafe to Pike's senior management does not mean that Mr. Alemy intended to violate the law. Indeed, the frequency and breadth of Mr. Boule's complaints led to the conclusion that Mr. Alemy concluded that Mr. Boule's primary focus was complaining, not safety.

(Doc. 49 at 6.) Accordingly, for purposes of summary judgment, Mr. Boule has established that pre-termination he made complaints about safety to Pike's supervisory personnel.

Pike's further argument, that the individuals who terminated Mr. Boule's employment were unaware of his safety concerns, is similarly undermined by Mr. Boule's disputed factual claim that he made numerous verbal safety complaints directly to Mr. Rielly who was involved in his termination and who was present when Mr. Boule made a comment regarding his desire to avoid an accident and getting hurt. Construing these facts in the light most favorable to Mr. Boule, at least one of the persons involved in his termination was aware that Mr. Boule had raised safety concerns.

Pike's final argument in support of dismissal of the promissory estoppel claims is that Mr. Boule's "'concerns about workplace safety,' do not excuse his conduct on May 12, 2011. No rational jury could say that his termination violated promises Pike had made to the plaintiff." (Doc. 23-1 at 18-19.) As Pike correctly points out, a promise to refrain from retaliation in response to a safety report does not immunize an employee from all disciplinary action thereafter. *See Woolaver v. State*, 2003 VT 71, ¶ 39, 175 Vt. 397, 412, 833 A.2d 849, 861 (Vt. 2003) (affirming dismissal of promissory estoppel claim, noting that a promise of continued employment and an extended probationary period did not guarantee plaintiff would not be fired for any reason during the period following her pregnancy as "the alleged promises do not go far enough to extend to plaintiff the kind of protection she seeks."). Conversely, however, a concession by Mr. Boule that he violated certain of Pike's policies does not automatically guarantee judgment in Pike's favor. While courts generally agree that an employer who terminates an employee who has physically or verbally assaulted a supervisor, co-worker, or client has asserted a legitimate basis for the termination,[7] the surrounding facts and

---

[7] *See Trustees of Boston Univ. v. N.L.R.B.*, 548 F.2d 391, 392 n.4 (1st Cir. 1977) (noting that "[c]ourts have been unwilling to overlook blatant misconduct such as physical intimidation.").

circumstances may nonetheless permit the employee to recover.[8] Here, whether any physical assault occurred is disputed and at least Mr. Boule's and Paul Morse's version of the events would cast Mr. Alemy in the role of the aggressor. Viewing these facts in the light most favorable to Mr. Boule, the court cannot conclude that no rational juror could reach a verdict in Mr. Boule's favor.

As for the remaining element of promissory estoppel,

> Whether injustice can be avoided only by enforcement of the promise is a question of law informed by several factors, including: (a) the availability and adequacy of other remedies, particularly cancellation and restitution; (b) the definite and substantial character of the action or forbearance in relation to the remedy sought; (c) the extent to which the action or forbearance corroborates evidence of the making and terms of the promise, or the making and terms are otherwise established by clear and convincing evidence; (d) the reasonableness of the action or forbearance; [and] (e) the extent to which the action or forbearance was foreseeable by the promisor.

---

[8] *See Unified Gov. of Wyandotte County/Kansas City v. IBEW Local 53*, 286 P.3d 570, 575 (Kan. App. 2012) (affirming arbitrator's decision to reduce discipline from termination to lesser sanction for "provoked" employee who assaulted co-worker because of mitigating circumstances); *Van Horn v. Specialized Support Servs., Inc.*, 269 F. Supp. 2d 1064, 1071-74 (S.D. Iowa 2003) (female former employee who was terminated for slapping client with Down's syndrome after he grabbed her breast was engaged in protected oppositional activity and was entitled to recover on retaliation claim); *Excel Corp. v. Bosley*, 165 F.3d 635, 638 (8th Cir. 1999) (affirming judgment in favor of employee on sexual harassment claim where employee pushed her ex-husband/fellow employee who was sexually harassing her, was placed on "indefinite suspension," and thereafter "pushed past a supervisor" to confront the ex-husband which led to employee's termination); *MLRS Systems Div.*, 788 F.2d 1378, 1384 (8th Cir. 1986) (collecting cases where employer disciplined employee engaged in protected activity for "intemperate language" and holding that "an employer may not rely on employee conduct that it has unlawfully provoked as a basis for disciplining an employee"); *Trustees of Boston Univ.*, 548 F.2d at 391 (noting "Ms. Schiffer had been offensive on a number of occasions in dealings with supervisors and fellow employees, including . . . when she brandished a pair of scissors" but holding "that Ms. Schiffer's misconduct was stimulated by the employer's own wrongful conduct, and that her firing was motivated not by the legitimate considerations but by illegal considerations[.]").

*Tour Costa Rica*, 758 A.2d at 801-02. "Although this is a question of law," it necessarily "depend[s] upon the circumstances of the case." *See id.* at 801-02 & n.4. Here, those circumstances are in dispute and must be determined by a jury.[9]

For the foregoing reasons, Pike's motion for summary judgment with regard to Mr. Boule's promissory estoppel claim set forth in Count 1 is hereby DENIED.

### C.      Breach of Implied Contract Claim.

In Count 3 of his Complaint, Mr. Boule alleges that Pike modified the at-will status of his employment and created an implied contract that required Pike to conduct a fair investigation of an alleged violation of its policies and impose discipline, if any, commensurate with the severity of the offense. Mr. Boule contends that the implied contract further prohibited Pike from disciplining or terminating Mr. Boule in retaliation for making good faith, reasonable complaints about safety. Finally, Mr. Boule asserts that his repeated complaints about safety were a proximate cause of his termination and tainted the allegedly cursory investigation which led to his dismissal.

Pike seeks summary judgment with regard to Count 3, arguing that Pike's Manual and other company documents are "unequivocal, clear and simple" and that "[a] reasonable jury would have to conclude that Mr. Boule's employment was at-will and could be terminated with or without notice at any time at his or Pike's option." (Doc. 23-1 at 18.) Pike denies that its Manual contains a progressive discipline policy or that Pike was under any contractual obligation to refrain from terminating Mr. Boule, notwithstanding any safety complaints made by him.

Under Vermont law, when an employee is hired for an indefinite term, the employee is considered at-will unless there is evidence to the contrary. *Dillon*, 819 A.2d at 706-07. However, "the presumption that employment for an indefinite term is an 'at-will' agreement is simply a general rule of contract construction" and "when an employer takes steps to give employees the impression of job security and enjoys the attendant

---

[9] In *Tour Costa Rica*, the Vermont Supreme Court held that the term "enforcement of the promise" is not to be taken literally, and that a jury award of damages may provide the requisite "enforcement." *Tour Costa Rica*, 758 A.2d at 801 n.3.

benefits that such an atmosphere confers, it should not then be able to disregard its commitments at random." *Id.* at 706 (noting that "at-will employment relationships have fallen into disfavor").

An employer may modify an at-will employment agreement unilaterally either through its written policies or practices, or both. *Id.* at 707. Moreover, "[a]n employer not only may implicitly bind itself to terminating only for cause through its manual and practices, but may also be bound by a commitment to use only certain procedures in doing so." *Id.*

The Vermont Supreme Court has not abrogated, "in the employment context, the long-standing law of contract that the interpretation of *unambiguous* writings is a matter of law for the court, as is the determination of *whether* a writing is ambiguous." *Id.* (internal citations and quotations omitted). "Only after a determination that the writing is ambiguous should the interpretation of the writing be submitted to the jury." *Id.* at 707-08 (citations omitted).

As Pike points out, Mr. Boule signed a pre-employment statement, acknowledging that his employment was at-will and that only a written agreement signed by him and the president of Pike could vary this status. The Manual contains a similar provision. The Manual, however, also sets forth a "disciplinary action policy" which although it states that, "[e]mployment at Pike is considered at-will and Pike reserves the right to discharge an employee without cause and without prior notice," (Doc. 23-4 at 37), contains provisions that reasonably support a conclusion that Pike will not terminate an employee without cause and without following certain procedures. For example, the Manual states that "[f]ailure to observe established safety rules and safe work practices will result in disciplinary action." *Id.* It provides that discipline may be imposed, "depending on the seriousness of the offense and the employee's cumulative records," *id.*, and then sets forth a gradation of disciplinary measures: verbal warning, written warning, suspension without pay, and termination, without specifying whether this is an order of discipline to be followed or merely examples of discipline that may be imposed. The Manual requires an employee's supervisor to document all forms of discipline and to place all written

warnings in the employee's file and provides that "[c]ertain conduct may result in immediate termination, based on the severity of the incident and surrounding circumstances, as well as repeat occurrence(s)." *Id.* Although these provisions, in isolation, do not appear to impose a system of progressive discipline, they are contained in a section of the Manual wherein Pike also promises to "abide by the Oldcastle [Disciplinary Guidelines]," *id.*, which contain a disciplinary system that arguably constitutes progressive discipline.

The Oldcastle Disciplinary Guidelines set forth a system of discipline (in the form of "strikes") which indicate what an employee may expect in terms of discipline for a specific offense. This system of discipline may be bypassed only where there is a "willful disregard of safety that has or could have resulted in serious injuries to the employee or co-worker." (Doc. 23-4 at 38.) This section of the Manual thus clearly contains promises of specific treatment for specific circumstances.

The Manual also contains Pike's WPV Policy which requires employees to immediately report "[a]ny potentially dangerous situation" and which promises that "all reported incidents will be investigated" and that "[r]eports or incidents warranting confidentiality will be handled appropriately and information will be protected as much as is practical." *Id.* This provision imposes an affirmative obligation to report safety concerns and promises specific treatment, including an investigation, in the event a report is made.

Collectively, the provisions of the Manual are ambiguous because although the Manual repeatedly states that employment is at-will and that discharge from employment can occur without notice or cause, it also reflects Pike's commitment to investigate any incident that may give rise to discipline, consider the surrounding circumstances and the employee's record before any discipline is imposed, and impose discipline commensurate with the seriousness of the offense. "When the terms of a manual are ambiguous . . . or send mixed messages regarding an employee's status, the question of whether the presumptive at-will status has been modified is properly left to the jury." *Dillon*, 819 A.2d at 708. "This may be the case even if there is a disclaimer stating employment is at-

will, as the presence of such a disclaimer is not dispositive in the determination." *Id.* (citing *Farnum v. Brattleboro Retreat, Inc.*, 671 A.2d 1249, 1254 (Vt. 1995)) ("The mere inclusion of boilerplate language providing that the employee relationship is at will cannot negate any implied contract and procedural protections created by an employee handbook.").

The Manual further reflects Pike's commitment to follow the Oldcastle Disciplinary Guidelines which set forth a progressive three strike disciplinary procedure. The Manual thus contains "definitive policies, which expressly or impliedly include a promise for specific treatment in specific situations." *Ross v. Times Mirror, Inc.*, 665 A.2d 580, 584 (Vt. 1995). Pike all but concedes this interpretation of the Manual is reasonable. *See* Doc. 23-1 at 22 ("Given Pike's explicit, written discipline policies, Mr. Boule had to have known that his conduct would have resulted in his termination."). The Vermont Supreme Court has held that "[h]andbook provisions committing the employer to a progressive discipline system are sufficient for a jury to find that the employer may terminate the employee only for cause." *Trombley v. Southwestern Vermont Med. Ctr.*, 738 A.2d 103, 108 (Vt. 1999). Where, as here, there is a dispute regarding whether the Manual provides for progressive discipline, the court should "submit[]the nature of the employment relationship to the jury." *Id.*; *see also Logan v. Bennington College Corp.*, 72 F.3d 1017, 1022 (2d Cir. 1995) ("Under Vermont law, disputes concerning the agreed-upon terms and conditions of an employment contract are an issue of fact for the jury to decide.").

A court may also consider whether the employer routinely engages in disciplinary proceedings that are inconsistent with an at-will employment arrangement. *See Dillon*, 819 A.2d at 709; *Benoir v. Ethan Allen, Inc.*, 514 A.2d 716, 718 (Vt. 1986) (court may consider other evidence in addition to personnel manual in determining whether there exists an implied-in-fact promise for continued employment, including practices of the employer). The two inquiries are not necessarily distinct, and each "can provide context for and help inform the determination" of the other. *See Dillon*, 819 A.2d at 708-09 (noting that "an employer's practices can provide context for and help inform the

determination" of whether "the terms of a manual are ambiguous," and finding that the defendant's employment practices established ambiguity when they were "consistent with the manual *and* inconsistent with an at-will employment arrangement"). In this case, Mr. Boule cites at least some evidence that supports a conclusion that Pike has never terminated an employee without notice or cause during Mr. Boule's relatively lengthy tenure with the company.

Pike nonetheless argues that regardless of how the Manual is interpreted, Pike had good cause to terminate Mr. Boule and no rational juror could conclude otherwise. It points out that the Manual states that "certain conduct may result in immediate termination, based on the severity of the incident and the surrounding circumstances, as well as repeated occurrence(s)" (Doc. 23-4 at 37) and identifies conduct within this category to include "engaging in behavior, either verbal or physical, which is intimidating, threatening, or abusive towards supervisors [or] co-workers[,]" "failure to follow a supervisor's directions or instructions," and "loud or abusive behavior." *Id.* Pike's argument is not without force as Mr. Boule admits that his behavior was loud and violated Pike's policies. Indeed, Mr. Boule's behavior could readily be characterized as insubordinate, intemperate, abusive, and inappropriate.[10] However, for purposes of summary judgment, the court must examine this same evidence in the light most favorable to Mr. Boule. When examined from this perspective, and when the disputed facts are taken into consideration, the outcome is less certain.

Pike does not dispute that apart from the confrontation, Mr. Boule was a productive and valued employee at Pike for approximately nine years. Pike was also aware that it was Mr. Boule's wont to engage in joking repartee with other Pike employees which he referred to as "busting their chops." According to Mr. Boule, he was engaged in this type of light-hearted conversation with a co-worker about the cross-training program when Mr. Alemy, who overheard the conversation, angrily interrupted it, confronting Mr. Boule in front of his fellow employees with profanity and statements

---

[10] Mr. Alemy's behavior arguably shared these same characteristics with the exception of insubordination and he was disciplined but not terminated.

suggesting that he no longer wanted to hear Mr. Boule's complaints. A supervisor's directive to an employee not to express safety concerns would, itself, have been a serious violation of Pike's policies. *See* Doc. 23-4 at 38 ("Any potentially dangerous situation must be reported immediately to a supervisor" and "[a]ny supervisor who is aware of and allows an unsafe act will receive the same discipline as the employee").

Moreover, according to Mr. Boule and Paul Morse, Mr. Alemy both initiated the confrontation and was responsible for any physical contact that occurred. Thereafter, Mr. Alemy provided Pike with a version of the events that cast Mr. Boule in the role of the aggressor and stated that Mr. Boule had come at Mr. Alemy and pushed him with his stomach. Mr. Alemy did not disclose his own use of profanity and arguably did not accurately describe who initiated the confrontation, what transpired, and whether it implicated a safety concern. Rather than fully investigate the matter, Pike relied upon Mr. Alemy's description of the events and terminated Mr. Boule for what otherwise appeared to be a first offense of insubordination and loud behavior. There is no evidence that Pike considered Mr. Boule's employment record or the surrounding circumstances in making the decision to terminate him.

The Vermont Supreme Court's decision in *Dulude v. Fletcher Allen Health Care, Inc.*, 807 A.2d 390 (Vt. 2002) explained when a court, rather than a jury, may determine whether an employer has "just cause" to terminate an employee:

> In a case governed by a specific just cause clause in a collective bargaining agreement, this Court defined 'just cause' for employment termination as some 'substantial shortcoming detrimental to the employer's interests, ... which the law and a sound public opinion recognize as a good cause for his dismissal.' *In re Brooks,* 135 Vt. 563, 568, 382 A.2d 204, 207 (1977) (internal citations omitted). The ultimate criterion of just cause is whether the employer acted reasonably in discharging the employee because of misconduct. *Id.* To be upheld, discharge for just cause must meet two criteria of reasonableness: one, that it is reasonable to discharge the employee because of certain conduct, and the other, that the employee had fair notice, express or fairly implied, that such conduct would be grounds for discharge. *Id.* at 568, 382 A.2d at 207–08; *Nadeau v. Imtec, Inc.,* 164 Vt. 471, 475, 670 A.2d 841, 844 (1995). This case does not present an issue of whether the employee had adequate notice. Thus, the Court is

concerned only with the determination that there existed just cause for Dulude's termination.

* * *

The undisputed facts in this case establish that FAHC, under an objective good faith standard, had just cause to terminate Dulude's employment. FAHC, concerned at the very least with Dulude's failure to comply with the multiple letters of understanding, and with a potential threat to patient safety looming, warned Dulude repeatedly that her narcotic administration practices were inconsistent with accepted practices. In addition, there were three patient complaints, all relating to Dulude's narcotic administration, which raised questions about her competence in this area. These long-standing performance issues, made known to Dulude through letters of understanding and conversations with her supervisors, coupled with a series of incidents involving questionable narcotic administration, constitute substantial evidence to support FAHC's decision to terminate her. Dulude does not dispute that she knew FAHC was concerned with her narcotic administration practices and that failure to change her methods would put her employment with FAHC at risk. Nor does she deny she was warned. She simply continues to assert that her philosophy of narcotic administration is best. Dulude has raised no issue of material fact concerning FAHC's reasonable belief that her administration of narcotics was faulty. As the employer with ultimate responsibility, FAHC may, indeed must, set its own standards for drug administration.

*Id.* at 396.

Here, in contrast to *Dulude*, Mr. Boule challenges the facts surrounding his termination as well as Pike's motivation for terminating him. This is also not a case in which "long-standing performance issues, made known" to Mr. Boule culminated in his termination. The case is thus more analogous to *Clement v. Woodstock Resort Corp.*, 687 A.2d 886 (Vt. 1996) than to *Dulude* because whether Mr. Boule's conduct warranted his immediate termination is at "the heart of the dispute" and the evidence is "sharply in conflict." *Id.* at 888. In such circumstances, assuming the jury finds that the at-will status of Mr. Boule's employment was modified, the jury must also make the determination of whether the termination was authorized by the terms of the parties' implied contract, and was reasonable. *Id.* at 887-88 ("Assuming the jury determined that the employer's handbook and policy manual modified the at-will employment

27

relationship . . . [in light of the conflicting evidence] [t]he jury could thus have reasonably determined that plaintiff's misconduct did not justify immediate termination and that he should have been given further verbal and written warnings.").

Because there are genuine issues of material fact that require a jury's determination, Pike has not demonstrated that it is entitled to judgment as a matter of law on Mr. Boule's implied contract claim. Pike's motion for summary judgment with regard to Count 3 is therefore DENIED.

### D.    Retaliation for VOSHA Complaints.

In his Complaint, Mr. Boule alleges that during his employment at Pike he observed that numerous mandatory safety rules and policies were being violated by his co-workers, supervisors, and site management. He provides four specific examples of the alleged violations and asserts that he complained to his foreman, the yard manager, and the area manager about each of them. He alleges that these individuals were aware that he was the sole Pike employee complaining about safety, and ignored his concerns. In Count 4, he alleges that under VOSHA he had a right to a safe workplace, the right to complain to supervisory personnel and management about unsafe practices, and the right to contact Pike's toll-free hotline about unsafe practices. He further alleges that his safety complaints were a contributing factor in his employment discharge which he alleges is a violation of VOSHA.

Pike seeks summary judgment with regard to Count 4, although its initial memorandum of law contains no argument as to why this claim, in particular, should be dismissed. On that ground alone, denial of the motion is appropriate under Fed. R. Civ. P. 56(a) which requires the moving party to demonstrate that it is entitled to judgment as a matter of law, under the court's Local Rules which require a memorandum to state the party's legal contentions and supporting case law, as well as under existing jurisprudence.[11] However, Mr. Boule has briefed why summary judgment should be

---

[11] *See Jimmo v. Sebelius*, 2011 WL 5104355, at *22 n.13 (D. Vt. Oct. 25, 2011) (declining to address grounds for dismissal that were only cursorily addressed in the briefing); *Ibarra v. City of Chicago*, 2011 WL 4583785, at *8 (N.D. Ill. Sept. 28, 2011) ("Given the complexity of the

denied with regard to Count 4 and in its Reply, Pike responds to those arguments. In addition, post-hearing, both parties have addressed the claim in supplemental memoranda. Because whether summary judgment should be granted with regard to Mr. Boule's VOSHA claim has been fully briefed, the court will deem the issue properly before the court.

In essence, Pike seeks summary judgment because no one in a decisionmaking position at Pike knew of Mr. Boule's alleged safety complaints and because those safety concerns were not made in a manner recognized as "protected activity." Mr. Boule counters that there is evidence that he was in the midst of a safety complaint when the confrontation erupted and that, but for his honest complaint about workplace safety, Mr. Alemy would not have yelled an obscenity at him that triggered the confrontation which led to Mr. Boule's discharge. He points out that there are disputed issues of fact regarding the number and the nature of the safety complaints he made, as well as to whom they were made. He argues that under the "cat's paw" theory adopted by the Supreme Court in *Staub*, an employer cannot avoid liability for an employment decision made by an innocent decisionmaker on the basis of information supplied by a supervisor whose own acts or motivations are unlawful.

VOSHA provides in relevant part that:

> No person shall discharge or in any manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this chapter or has testified or is about to testify in any such proceeding or because of the exercise by such employee on behalf of himself, herself, or others of any right afforded by this chapter.

21 V.S.A. § 231(a). Although VOSHA is "patterned after the federal [Occupational Safety and Health Act ("OSHA"),]" *Green Mountain Power Corp. v. Comm'r of Labor*

---

legal issues, the parties' cursory treatment of the issues, and the current stage of the litigation, the Court declines to dismiss Count II at this time."); *Allstate Ins. Co. v. Heil*, 2007 WL 4270355, at *2 n.2 (D. Haw. Dec. 6, 2007) ("Because the parties have not briefed the Rule 702 issue in anything more than a cursory way as part of their summary judgment arguments, the court declines to resolve the expert admissibility issues on the record before it.").

*and Industry*, 383 A.2d 1046 (Vt. 1978), VOSHA provides for a private right of action for any aggrieved employee, 21 V.S.A. § 232, while OSHA does not. *See Donovan v. Occupational Safety and Health Review Comm'n*, 713 F.2d 918, 925 (2d Cir. 1983) ("Under OSHA, employees do not have a private right of action."); *see also George v. Aztec Rental Center, Inc.*, 763 F.2d 184, 187 (5th Cir. 1985) ("We therefore hold that there is no private cause of action under federal law for a private employer's retaliatory discharge of an employee contrary to section 11(c)" of OSHA).

In *Mellin v. Flood Brook Union Sch. Dist.*, 790 A.2d 408 (Vt. 2001), the Vermont Supreme Court held that in order to survive summary judgment, a plaintiff alleging VOSHA retaliation must establish four elements of a prima facie case: (1) the plaintiff employee was engaged in a protected activity; (2) the defendant employer knew of that activity; (3) plaintiff suffered an adverse employment action; and (4) a causal connection exists between plaintiff's protected activity and the adverse employment action. *Id.* at 417-18. If the plaintiff establishes a prima facie case, the defendant must proffer a legitimate, nondiscriminatory reason for its actions. *Id.* at 418. If the defendant sustains this burden, the plaintiff must prove by a preponderance of the evidence either that the purported reason was a pretext for retaliation or that the defendant has mixed motives one of which was retaliatory and was a motivating factor in its decision. In a retaliation claim, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Robertson v. Mylan Laboratories, Inc.*, 2004 VT 15, ¶18, 176 Vt. 356, 364, 848 A.2d 310, 319 (citing *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)).

"At the prima facie case stage, the plaintiff's burden is a relatively light one." *Beckmann v. Edson Hill Manor, Inc.*, 764 A.2d 1220, 1222 (Vt. 2000) (adopting the identical analytical framework set forth in *Mellin* for Vermont Fair Employment Practices Act ("FEPA") claims and observing that the framework is derived from the burden-shifting analysis articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973)); *see also Carpenter v. Central Vermont Med. Ctr.*, 743 A.2d 592, 595 (Vt. 1999) (Plaintiff's burden of proof in the prima facie case is minimal. The Court of

Appeals for the Second Circuit has repeatedly called it 'de minimus'") (citations, including internal citations, omitted).

With regard to Mr. Boule's prima facie case, Pike first challenges whether Mr. Boule was engaged in "protected activity" at any time during his employment because although he made various complaints, he "never made a charge, never testified, never participated in any manner in an investigation proceeding or hearing and never alleged that the cross-training violated federal and state workplace safety regulations." (Doc. 44 at 12.) Pike cites no authority for its contention that the Vermont Supreme Court would construe VOSHA's retaliation provisions so narrowly.

VOSHA prohibits retaliation against any employee who is exercising "any right afforded by this chapter." 21 V.S.A. § 231(a). Neither VOSHA nor the Vermont courts have defined the extent of this protection although an employee's rights under VOSHA include the right to make complaints about workplace safety. The Vermont Supreme Court has construed the anti-retaliation provisions of FEPA, which protect employees who have "lodged a complaint," to extend to oral complaints made to supervisors. *See, e.g.*, *Beckmann*, 764 A.2d at 1221-23 (holding that where supervisor told employee "you've got a really nice ass" and employee responded "[t]hat's called sexual harassment[,]" her oral complaint was protected under FEPA and she "satisfie[d] both the first and second elements" of a FEPA retaliation claim).

The Second Circuit has broadly defined "protected activity" as "action taken to protest or oppose statutorily prohibited discrimination." *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 566 (2d Cir. 2000) (defining the term "protected activity" in the context of a retaliation claim under Title VII). Other courts have similarly adopted a broad construction and have held that "filed any complaint" encompasses oral complaints. *See, e.g., Bohn v. Cedarbrook Eng'g Co.*, 422 N.W.2d 534, 536-37 (Minn. Ct. App. 1988) (construing Minnesota's counterpart to OSHA and finding that the provision which protects "any employee who has 'filed any complaint'" applies to oral as well as written complaints); *Power City Elec., Inc.*, 1979 WL 23049, at *1 (E.D. Wash. Oct. 23, 1979) (denying employer's motion to dismiss or in the alternative for summary judgment and

holding "an oral complaint to an employer regarding unsafe conditions is a protected activity under [OSHA]"). In construing the anti-retaliation provisions of the Fair Labor Standards Act, which protects employees who have "filed any complaint," the United States Supreme Court has held that protection against retaliation extends to oral complaints "where the recipient has been given fair notice that a grievance has been lodged." *Kasten v. Saint-Gobain Performance Plastics Corp.*, 131 S. Ct. 1325, 1334-36 (2011) ("We conclude that the [lower court] erred in determining that oral complaints cannot fall within the scope of the phrase 'filed any complaint' in the Act's antiretaliation provision."). In light of this precedent and the public policy underpinning VOSHA, the court predicts that the Vermont Supreme Court will interpret VOSHA as protecting from retaliation employees who make verbal workplace safety complaints to an employer when the employer has fair notice of the nature of the complaint and the fact that it has been lodged.

Here, for purposes of a prima facie case, Mr. Boule has established that he was engaged in protected activity during the course of his employment when he made complaints about the safety of the cross-training program and that Pike, through its supervisory personnel, was aware of such complaints. Mr. Boule has also established that he suffered an adverse employment action. With regard to the remaining element of his prima facie case, a causal connection exists between protected activity and the adverse employment action, Mr. Boule may "establish the required causation indirectly through the timing of [his] protected activity and [Pike's] alleged retaliatory actions." *Mellin*, 790 A.2d at 418. With regard to this element, Mr. Boule has proffered evidence that he was engaged in protected activity when the confrontation which led to his termination erupted and the adverse employment action occurred shortly thereafter. Examining this evidence in the light most favorable to Mr. Boule, he has established a prima facie case of VOSHA retaliation.

In turn, Pike relatively easily satisfies its burden of establishing a legitimate, nondiscriminatory reason for its actions as Mr. Boule admits that his conduct during the confrontation was loud and that it violated Pike's policies. For purposes of burden

shifting, this explanation, when considered in the context of the undisputed facts, will suffice. *See Holcomb*, 521 F.3d at 141 ("It is not our task, at the second stage of the *McDonnell Douglas* framework, to assess the credibility of [defendant's] witnesses; nor is it our role to determine whether the [defendant's] explanation of its action is convincing. Instead, we ask whether defendant has introduced evidence that, '*taken as true*, would *permit* the conclusion that there was a nondiscriminatory reason.'") (internal citations omitted).

The burden then shifts back to Mr. Boule to adduce sufficient admissible evidence to sustain his ultimate burden of establishing by a preponderance of the evidence that his termination was in part attributable to unlawful retaliation for his VOSHA complaints. To sustain this burden, Mr. Boule need not prove Pike's reason for termination was pretextual. Instead, as the Second Circuit explained in *Holcomb*:

> It is important to stress . . . that a plaintiff who . . . claims that the employer acted with mixed motives is not *required* to prove that the employer's stated reason was a pretext. A plaintiff alleging that an employment decision was motivated both by legitimate and illegitimate reasons may establish that the 'impermissible factor was a motivating factor, without proving that the employer's proffered explanation was not some part of the employer's motivation.'

*Id.* at 141-22.

To sustain his burden, Mr. Boule points to evidence that Mr. Alemy was frustrated by Mr. Boule's repeated safety complaints about the cross-training program and retaliated by provoking a confrontation with Mr. Boule when he was in the midst of one of those complaints. According to Mr. Boule and Mr. Morse, Mr. Alemy both initiated the confrontation and initiated any physical contact. When an employee is engaged in protected activity, and his or her supervisor is aware of that fact, greater leeway for intemperate employee behavior is afforded. As one court explained in the context of protected union activity:

> On the one hand, section 7 rights [of the National Labor Relations Act which give employees the right to self-organization and other concerted activities for the purpose of mutual aid or protection] are 'not a sword with

33

which one may threaten or curse supervisors[.]' On the other hand, if an employee's conduct is not egregious there is 'some leeway for impulsive behavior[.]' And the leeway is greater when the employee's behavior takes place in response to the employer's wrongful provocation.

> 'An employer cannot provoke an employee to the point where [he or] she commits . . . an indiscretion . . . and then rely on this to terminate [his or] her employment. The more extreme an employer's wrongful provocation the greater would be the employee's justified sense of indignation and the more likely its excessive expression.'

*Trustees of Boston Univ.*, 548 F.2d at 393 (internal citations omitted). "Further, at least so long as the employee's indiscretions are not major, it is immaterial that the employee's misconduct would constitute a sufficient reason for discharge if the actual reason for discharge is the employee's participation in concerted activity." *Id.* (internal footnote omitted); *see also Nat'l Labor Relations Bd. v. Thor Power Tool Co.*, 351 F.2d 584, 586 (7th Cir. 1965) (concluding that "when the entire record is considered there was substantial evidence to support the Board's finding that [employee's] discharge was the result of his having presented a grievance to the management" even though employee was overheard referring to company's superintendent as "the horse's ass" and was thereafter summarily discharged).

In this case, the underlying facts of the confrontation are disputed and thus the court cannot determine, as a matter of law, whether Mr. Boule's indiscretions were major or minor. As Mr. Boule points out, even Ms. Dimick has testified that she does not know whether Mr. Boule would have been terminated if she knew Mr. Alemy had initiated the confrontation, if she knew it involved safety, and if there had been no physical assault. (Doc. 29-5 at 49-50) Boule further argues that Mr. Alemy's allegedly fabricated version of the events not only contributed to Mr. Boule's termination, but actually brought it about. Whether Mr. Alemy was motivated to alter his version of the events in order to retaliate against Mr. Boule for his persistent safety complaints about the cross-training program is a question for the jury. However, the fact that he allegedly did not report those complaints to Pike in accordance with Pike's policies may be considered evidence

of a retaliatory motive. *See Mellin*, 790 A.2d at 418 (citing authorities for proposition that noncompliance with procedures can create an inference of retaliatory motive).

Pike's final argument is that there is no evidence that Mr. Zimmerman, who ultimately authorized Mr. Boule's termination, did so with knowledge that Mr. Boule was engaged in protected activity. The Vermont Supreme Court has not explicitly adopted or rejected the cat's paw theory. *See Lamay v. State*, 2012 VT 49, ¶10 n.2, 49 A.3d 559, 563 n.2 (citing *Staub* in an employment discrimination case and "assum[ing] without deciding that any discriminatory animus by . . . plaintiff's supervisor . . . could be attributable to the ultimate decision maker"). However, the Second Circuit has held in a Title VII retaliation case that a "plaintiff is entitled to succeed, 'even absent evidence of illegitimate bias on the part of the ultimate [decisionmaker],'" so long as there is "evidence from which a reasonable jury could infer that [the supervising employee] played a meaningful role in the decision to terminate [the plaintiff]." *Holcomb*, 521 F.3d at 143 (quoting *Bickerstaff v. Vassar College*, 196 F.3d 435, 450 (2d Cir. 1999)). In *Holcomb*, the Second Circuit held that summary judgment is inappropriate if there is a genuine issue of material fact regarding whether a supervisor, at least in part for discriminatory purposes, influenced the ultimate decisionmaker's decision to terminate an employee. *Holcomb*, 521 F.3d at 143. *Holcomb* is persuasive because the Vermont Supreme Court looks to Title VII jurisprudence when analyzing retaliation claims. *See Gallipo v. City of Rutland*, 656 A.2d 635, 642 (Vt. 1994) (citing *Manoharan v. Columbia Univ. Coll. of Physicians & Surgeons*, 842 F.2d 590, 593 (2d Cir. 1988)).

When the rationale in *Holcomb* is applied to this case, Mr. Alemy clearly played a critical role in the decision to terminate Mr. Boule and his allegedly fabricated version of those events was arguably a motivating factor in Pike's decisionmaking. In addition, there is a disputed issue of fact as to whether Mr. Rielly, who actually participated in the termination, was aware of Mr. Boule's safety complaints but had ignored them. Viewing the evidence in the light most favorable to Mr. Boule, whether retaliation in violation of VOSHA was a motivating factor in his termination must be determined by the jury. *See Mellin*, 790 A.2d at 418 (reversing grant of summary judgment where the plaintiff

proffered some evidence that a retaliatory motive contributed to the adverse employment action she suffered and where "a genuine issue for trial existed.").

For the foregoing reasons, Pike's motion for summary judgment with regard to Count 4 is DENIED.

### E. Wrongful Termination on the Basis of Compelling Public Policy.

In Count 5, Mr. Boule asserts a claim of wrongful termination on the basis of public policy. The Vermont Supreme Court has held that an at-will employee may be discharged with or without cause "unless there is a *clear and compelling* public policy against the reason advanced for the discharge." *Adams v. Green Mountain R.R. Co.*, 2004 VT 75, ¶ 5, 177 Vt. 521, 522, 862 A.2d 233, 235 (citation and internal quotation marks omitted). The Vermont Supreme Court has defined public policy as "the community common sense and common conscience, extended and applied throughout the state to matters of public morals, public health, public safety, public welfare, and the like[.]" *Id.* (citation omitted).

The public policy that Mr. Boule points to is the safety and health of workers as set forth in 21 V.S.A. § 201(a). As this court has previously held,"[u]nder Vermont law, where a statute creates a right or remedy unknown at common law, the statutory remedy preempts a common law cause of action." *Carroll v. Tropical Aquaculture Products, Inc.*, 2009 WL 385430, at *3 (D. Vt. Feb. 13, 2009) (citing *Winney v. Ransom & Hastings, Inc.*, 542 A.2d 269, 270 (Vt. 1988)); *see also Thayer v. Herdt*, 586 A.2d 1122, 1126 (Vt. 1990) ("When a statute . . . prescribes the mode of enforcing [the cause of action], that mode alone can be resorted to.") (citation and internal quotation marks omitted). Accordingly, while the "Vermont Supreme Court has found that the absence of a statutory directive does not preclude a finding of a public policy basis for a cause of action," *Carroll*, 2009 WL 385430, at *3 (citation omitted), a plaintiff may not "assert a common law claim on the basis of public policy notwithstanding and in addition to a statutory remedy, premised on a clear and compelling public policy predating the [statute]." *Id.*; *see also Fellows v. Earth Const., Inc.*, 794 F. Supp. 531, 538 (D. Vt.

1992) (finding preemption of common law wrongful discharge claim based upon sex discrimination where adequate statutory remedy existed).

Because Mr. Boule's wrongful termination claim based on public policy is wholly duplicative of his VOSHA retaliation claim, it is preempted by the adequate statutory remedy set forth in VOSHA. Summary judgment in Pike's favor is therefore GRANTED with regard to Count 5.

## CONCLUSION

For the foregoing reasons, the court GRANTS in part and DENIES in part Defendant's motion for summary judgment (Doc. 23.)

SO ORDERED.

Dated at Rutland, in the District of Vermont, this 27ᵗʰ day of February, 2013.

Christina Reiss, Chief Judge
United States District Court